UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



| | |
|---|---|
| UNITED STATES OF AMERICA : | CRIMINAL NO. 06-258 |
| v. : | VIOLATION: 18 U.S.C. §1962(d) <br> (Conspiracy to Participate in a Racketeer Influenced Corrupt Organization) |
| ARTHUR HANDON : <br> Defendant. : | |
| : | UNDER SEAL |

FILED

SEP 7 - 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

PROFFER OF EVIDENCE

If this case were to go to trial, the government's evidence would establish beyond a reasonable doubt:

1. From at least 1998, and continuing thereafter up to and including March of 2005, in the District of Columbia, and elsewhere, the defendant ARTHUR HANDON, aka JAY, was a member of an enterprise whose members and associates engaged in illegal drug trafficking principally in and around the Congress Park Public Housing Complex neighborhood in the District of Columbia, and the metropolitan vicinity, including the State of Maryland. This organization, including its leadership, members and associates, constituted a group of individuals associated in fact. The racketeering enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2. The principal goal of the racketeering enterprise was to obtain money and other things of value. It was a further goal of the enterprise to engage in various unlawful

activities in the District of Columbia, Maryland and elsewhere. These activities were intended to make money and illicit profits for its leaders, members and associates, from acts involving, but not limited to: trafficking in controlled substances, including cocaine base, in the form of crack cocaine, and acts of violence, including robbery, assaults and murder.

        3.       The purposes of the enterprise included: enriching the members of the enterprise through trafficking in controlled substances, namely cocaine base, also known as crack cocaine; creating, maintaining and controlling marketplaces for the distribution of controlled substances; enriching the members of the enterprise by committing acts of violence, including murder; enforcing discipline among its members; protecting the enterprise and its members from detection, investigation and apprehension by law enforcement, and from conviction for criminal charges; and promoting and enhancing the reputation and standing of the enterprise and its members.

        4.       The assorted activities of the enterprise affected interstate and foreign commerce and were conducted in the District of Columbia, Maryland and elsewhere.

        5.       During the same time, in the District of Columbia, Maryland and elsewhere, defendant HANDON, together with persons known and unknown to the government, being persons employed by and associated with the racketeering enterprise, unlawfully, knowingly and intentionally combined, conspired, confederated and agreed with each other to conduct and to participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The pattern of racketeering activity which HANDON conducted and participated in the conduct of the affairs of the enterprise consisted of the following acts, some of which constitute separate racketeering acts, as noted:

a. <u>Racketeering Act -- Illegal Drug Conspiracy</u>: From at least 1992, and continuing thereafter up to and including March of 2005, in the District of Columbia, and elsewhere, the defendant HANDON, and other members of the conspiracy did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other and with others, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute narcotic controlled substances.

i. It was a principal goal of the conspiracy that, in order to obtain as much money and other things of value as possible, the leaders, members and associates of the conspiracy, including HANDON, acquired cocaine base, also known as crack cocaine, which they distributed in the District of Columbia and elsewhere. It was a further goal of the conspiracy to create, maintain and control a market place for the distribution of its controlled substances.

ii. Members of the conspiracy, including HANDON, often worked together in various smaller groups, by, among other things: negotiating the sale, or agreeing to share the sale, or pooling their money for a purchase, or referring the buyer to another dealer associated with the conspiracy, or working together hand-in-hand to get a buyer his/her cocaine, or asking a buyer to come to him for his next sale. One example of how the members of the conspiracy cooperated with each other and shared resources and profits was the conspiracy's use of the term, "dos." If a potential customer approached one of the co-conspirators to buy drugs, when a second co-conspirator was also nearby, the second co-conspirator might yell "dos." This would mean that the second co-conspirator would share the sale with the first co-conspirator by getting a small portion of the sale for himself. Members of the conspiracy, including

HANDON, used this system in order to share profits and sales and enrich each other.

  b. On or about July 12, 2000, in the 3200 block of 13th Street, SE, within the District of Columbia, ARTHUR HANDON, aka Jay, possessed a Smith & Wesson .22 caliber pistol.

  c. <u>Racketeering Act -- Distribution of Cocaine Base, also known as crack</u>: On or about February 20, 2001, in the 3200 block of 13th Street, SE, within the District of Columbia, ARTHUR HANDON, aka Jay, distributed a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine. On that date, HANDON gave an individual 30 ziplocks filled with a rock-like substance in exchange for $200. The substance was later analyzed and determined to be 1.6 grams of cocaine base, in the form of crack.

  d. <u>Racketeering Act -- Distribution of Cocaine Base, also known as crack</u>: On or about March 8, 2001, in the 3200 block of 13th Street, SE, within the District of Columbia, ARTHUR HANDON, aka Jay, distributed a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine. On that date, HANDON gave an individual 72 ziplocks filled with a rock-like substance in exchange for $400. The substance was later analyzed and determined to be 4.3 grams of cocaine base, in the form of crack.

  6. In addition, during the course of the conspiracy, and to effect its object, HANDON did commit, among others, the following acts:

  a. Beginning in or about 1998 and continuing through approximately 2005, HANDON dealt crack cocaine in the Congress Park neighborhood. HANDON's main suppliers of crack cocaine were: Anthony Van Scott (aka Cat Eye Tony, aka Lampatone), Nick and Terry. In addition to these suppliers, HANDON was supplied cocaine by several other

individuals, including but not limited to: Gregory Bell (aka Boy-Boy), Burke Johnson, Desmond Thurston (aka Dazz), Joe Langley, Dante Arrington, Dink, and Bucky Fields, Sr.

    b. HANDON regularly supplied crack cocaine to various addicts in Congress Park, including but not limited to: Pinky, Vera, Denice, Tall Nisi, Gail, Keena, "Mr. James," Stan, Martin, November, and Marilyn. In addition, HANDON also supplied crack cocaine to other dealers in Congress Park, including but not limited to: Tone-Tone, Daniel Collins (aka DC), Raymond Bell (aka Santuce), Phil Wallace, Blackface, and Little Mike.

    c. While HANDON was supplied crack cocaine from Nick, he would occassionally meet with Nick in an apartment in the Lincoln apartment building in Congress Park. Nick would often cook up, cut up, and store crack cocaine in this apartment at the Lincoln. Nick shared this apartment with several people, including: Boy-Boy, Gerald Bailey (aka Chow-Wow), and Steve. In addition, Raymond Bell, Jr. (aka Santuce) would also spend a lot of time at this same apartment. HANDON purchased "wholesale" quantities of crack cocaine from Nick out of this apartment on some occassions. On other occassions, HANDON would purchase "wholesale" quantities of crack cocaine from Nick at other locations. On at least three different occassions, HANDON sent Nick into this apartment to purchase crack cocaine from Boy-Boy for him.

    d.. HANDON purchased crack cocaine from Boy-Boy on at least ten (10) occassions. On each of these occassions, HANDON never dealt directly with Boy-Boy, but rather had a middleman purchase the crack cocaine for him. HANDON utilized Nick, Keena, Derrick, and Raymond Bell, Sr. to act as his middlemen for these crack cocaine purchases from Boy-Boy. The most crack cocaine that HANDON ever purchased from Boy-Boy at one time was

an "8-ball" (approximately 3.5 grams).

    e. On several occassions, HANDON served as a middleman for associates of his who wanted to purchase crack cocaine from Terry. Specifically, at different times, HANDON purchased crack cocaine for Raymond Bell Jr. (aka Santuce), Daniel Collins (aka DC) and Phil Wallace by purchasing crack cocaine from Terry for each of them. On these occassions, HANDON purchased 8-balls and in some cases quarter ounces of crack cocaine from Terry for these associates.

    f. From approximately 1998 through 2000, HANDON purchased crack cocaine from Cat Eye Tony on an almost daily basis. This relationshp ended in or around 2000 when the two men got into an argument over Dante Arrington. Specifically, Cat Eye Tony thought that Arrington was "plotting" against Cat Eye Tony, and Cat Eye Tony wanted HANDON to intervene on his behalf. HANDON refused to do this. In addition, after this disagreement, HANDON stole approximately 300 "dimebags" of crack cocaine from Cat Eye Tony's car. The relationship between HANDON and Cat Eye Tony further deteriorated when HANDON accidentally shot Cat Eye Tony's girlfriend's child with a paintball gun. A few days later, HANDON got into a shootout with someone who HANDON believes was Cat Eye Tony's cousin. HANDON believes that Cat Eye Tony paid this cousin to shoot at HANDON. Nobody was wounded by any of the bullets fired during this shootout. During this shootout, HANDON fired his own weapon, which was a .9mm caliber pistol.

    g. HANDON also purchased wholesale quantities of crack cocaine from Joe Langley on a few occassions. However, the quality of Langley's crack cocaine was poor, so HANDON stopped dealing with Langley.

        h.        On one occassion, HANDON was "fronted" two 8-balls of crack cocaine by Desmond Thurston (aka Dazz), shortly before Dazz and his brother, Phil Wallace, were locked up for getting into a shootout with rivals from 10th Place, SE. Several months later, Dazz got out of jail, and pressed HANDON to pay him back the money for the two 8-balls that he fronted him. HANDON then repaid Dazz.

        i.        HANDON purchased large amounts of marijuana from Cool Wop and Dazz. On one occassion, HANDON bought a pound of marijuana from Cool Wop shortly after he had heard that Cool Wop had a lot of marijuana that he was trying to sell quickly. HANDON also brought and sold marijuana from and to Boy-Boy on multiple occassions.

        11.        For years, on a nearly daily basis, HANDON personally witnessed Boy-Boy and Dazz make sales of crack cocaine and/or marijuana to various people in the Congress Park neighborhood. HANDON has also witnessed Daniel Collins (aka DC) make sales of crack cocaine in the Congress Park neighborhood. HANDON also witnessed a lot of foot traffic in and out of Cool Wop's apartment building (1313 Congress Street, SE) that led him to conclude that Cool Wop was selling crack cocaine out of that building. However, HANDON never personally witnessed any hand-to-hand sales by Cool Wop.

<u>Limited Nature of Proffer</u>

12. This proffer of evidence is not intended to constitute a complete statement of all facts known by HANDON but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. HANDON has provided additional information about the conspiracy to the United States, which is not contained herein. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged Conspiracy to Participate in a Racketeer Influenced Corrupt Organization.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar No. 451058

_____
GLENN S. LEON
Assistant United States Attorney
New York Bar
555 4th Street, N.W., Room 4108
Washington, DC 20530
(202) 305-0174

_____
ANN H. PETALAS
Assistant United States Attorney
TX Bar No. 24012852
555 4th Street, N.W., Room 4112
Washington, DC 20530

DEFENDANT'S ACCEPTANCE

      I have read the Proffer of Evidence setting forth the facts as to my participation in a Conspiracy to Participate in a Racketeer Influenced Corrupt Organization, in violation of 18 U.S.C. §1962(d). I have discussed this proffer fully with my attorney, Robert L. Jenkins, Jr., Esquire. I fully understand this proffer and I acknowledge its truthfulness, agree to it and accept it without reservation. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 9-7-06

Arthur Handon
Defendant

ATTORNEY'S ACKNOWLEDGMENT

      I have read each of the pages constituting the government's proffer of evidence as to my client's participation in a Conspiracy to Participate in a Racketeer Influenced Corrupt Organization, in violation of 18 U.S.C. §1962(d). I have reviewed the entire proffer with my client and have discussed it with him fully.

Date: 9-7-06

Robert L. Jenkins, Jr. Esquire
Counsel for Arthur Handon